# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| SHELBY COUNTY, TENNESSEE, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GOVERNOR BILL LEE, in his official ) <br> Capacity as GOVERNOR OF THE ) <br> STATE OF TENNESSEE, ) <br> ) <br> Defendant. ) | Case 2:21-cv-02550-SHL-atc |

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS
## FOR LACK OF SUBJECT MATTER JURISDICTION
## AND FOR FAILURE TO STATE A CLAIM

Defendant Bill Lee, Governor of the State of Tennessee ("Defendant"), in his official capacity moves to dismiss Plaintiff Shelby County, Tennessee's (the "County") Verified Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6). The County lacks standing to bring suit, it fails to state a claim pursuant to either the Fourteenth Amendment or the American Rescue Plan Act of 2021 ("ARPA"), and, because the County is not entitled to relief under federal law, the Court should decline to assert supplemental jurisdiction over the County's state-law claim; regardless, that claim lacks merit and dismissal is due.

## PROCEDURAL SETTING

The County filed a Verified Complaint against Defendant. (ECF 1, PageID 1.) The County alleges that its health department issued a directive requiring all persons to wear a mask if they were "two years old or older and . . . enter[ed] any indoor area of a K-12 grade school, Pre-K school, or daycare facility in Shelby County" "unless a valid CDC exception applie[d]." (*Id.*, at

3.)  Thereafter, Defendant issued Executive Order 84 (the "EO") that permitted parents and guardians to opt their child out of any mandatory mask requirements in school functions "for a student in kindergarten through twelfth-grade." (*Id.*)  The County contends that the EO prevents it "from being able to enforce mask-wearing by children in schools." (*Id.*, at 4.)

The County asserts three causes of action against Defendant.  First, it contends that the EO "shocks the conscience" under "the Substantive Due Process Clause" of the Fourteenth Amendment because it "bars [the] County . . . from exercising its authority . . . to require universal masking in schools." (*Id.*, at 6-7.)  Second, the County claims that the EO "unlawfully interferes with [its] obligations to provide for the health, safety, and public education to the children of Shelby County" pursuant to the Education Clause of the Tennessee Constitution. (*Id.*, at 7-8.)  Third, the County alleges that the EO "violates the rules and regulations implemented by the [United States Department of Education] under" ARPA. (*Id.*, at 9-10.)  The County requests "injunctive relief and a declaratory judgment" for all three of its claims. (*Id.*, at 8-10.)

## ARGUMENT

**The Court Should Dismiss the County's Verified Complaint.**

Defendant is entitled to dismissal of the County's claims.  The Court lacks subject-matter jurisdiction over the asserted federal claims because the County does not have standing under ARPA or the Fourteenth Amendment.  But even if it had standing, the County fails to state a claim upon which the Court could grant relief.  Defendant's decision to encourage masking in public schools while respecting parents' constitutional rights to the care, custody, and control of their children does not shock the conscience under the Fourteenth Amendment.  The County also has no private right of action under ARPA, nor does the EO conflict with the law or its implementing regulations.  And because the County's federal-law claims are due to be dismissed, the Court

2

should decline to assert supplemental jurisdiction over its state-law claim; regardless, the Education Clause does not assign the County the duty to provide students an education. Since the County lacks standing, and it otherwise fails to state a cognizable claim for relief, the Court should dismiss its claims.

**I.      Legal Standard**

The Federal Rules of Civil Procedure permit a defendant to move to dismiss a complaint for "lack of subject-matter jurisdiction" and for "fail[ing] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(1), (6). A federal court has subject-matter jurisdiction over a suit only if it has the "statutory or constitutional *power* to adjudicate the case." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (emphasis by the Court). A motion challenging a district court's subject-matter jurisdiction falls within two general categories: facial attacks and factual attacks. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). Facial attacks go "to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true"; factual attacks challenge "the factual existence of subject matter jurisdiction" and grants a court "broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings." *Cartwright v. Garner*, 751 F.3d 752, 759-60 (6th Cir. 2014). A defendant makes a factual attack on a district court's jurisdiction when the attack is "based upon evidence . . . not incorporate[d] into the complaint." *Foster v. Health Recovery Servs., Inc.*, 493 F. Supp. 3d 622, 629 (S.D. Ohio 2020) (citing *Cartwright*, 751 F.3d at 760). To survive the motion, "the plaintiff has the burden of proving [the court's] jurisdiction." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

In reviewing a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court "must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded factual allegations as true." *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claims need "facial plausibility" to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Additionally, the complaint must contain "more than labels and conclusions"; mere "formulaic recitation[s] of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. In other words, the complaint "must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016) (internal quotation marks omitted). If a plaintiff fails to "nudge[ his] claims across the line from conceivable to plausible," the court should dismiss the complaint. *Twombly*, 550 U.S. at 570.

## II.     The County Lacks Article III Standing to Pursue Its Claims against Defendant.

To demonstrate that it has Article III standing, the County must make three showings. First, it must establish that it has suffered an "injury in fact"—an invasion of a legally protected interest that is both (1) "concrete and particularized" and (2) "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks omitted). Second, the County must demonstrate that there is a "causal connection" between its alleged injury and the conduct of which it complains. *Id.* at 560. Third, it must show that "the injury will be

redressed by a favorable decision." *Id.* (quotation marks omitted). Here, the County fails to demonstrate that it has standing to assert its ARPA and Fourteenth Amendment claims.[1]

      **A.**      **The County cannot establish that it has suffered an injury in fact under ARPA.**

The County fails to show that it has suffered (or will suffer) any concrete injury regarding its ARPA claim. It contends that it has standing because the hypothetical loss of ARPA funds affects the budget of Shelby County Schools ("SCS"). The only support it draws for this claim, however, is that a local education agency ("LEA") under Tennessee law includes county school systems. The County further alleges that it "adopt[s] a budget" for SCS "through" the Shelby County School Board (the "Board"), which itself received ARPA funds that it distributed to the schools. (ECF 1, PageID 8-10, at ¶¶ 41-46.)

The County's allegations on this point are highly attenuated: the ARPA funds go to the LEAs via the State, and the County has no right to them. Under both federal and state law, the definition of LEA equates to the *school system*, not the county. 20 U.S.C. § 7801(30)(A); Tenn. Code Ann. § 49-1-103(2). ARPA also relied upon this definition of LEA, Pub. L. 117-2, 135 Stat. 4, § 2001(h)(1), and makes clear that the State distributes the funds *to the LEAs*, *id.* § 2001(d).

The County argues that its relationship to SCS through the Board (which it supposedly "administer[s]" (ECF 1, PageID 9, at ¶ 41)[2]) is enough to vest it with standing. But "[i]n Tennessee, the school systems operate separately from the county governments." *Rollins v. Wilson Cnty. Gov't*, 154 F.3d 626, 627 (6th Cir. 1998). Although the County relies on its budget approval

---

[1] Since Defendant relies upon evidence "not incorporate[d] into the complaint" in challenging the existence of subject-matter jurisdiction, the Court should view the challenge as a factual attack. *See Foster*, 493 F. Supp. 3d at 629.

[2] *But see* Tenn. Code Ann. § 49-1-102(c) (stating that LEAs "shall be administered by . . . [a] local board of education[] and . . . [a] director of schools").

5

responsibilities (ECF 1, PageID 9, at ¶ 41), its control over the budget is limited: "While the county governments approve the school systems' funding, different officials administer each entity[, and the] county school board and superintendent manage the school system without input from other county officials." *Rollins*, 154 F.3d at 627. The County has not asserted that it will be forced to reimburse SCS or the Board for any disgorged or withheld funds. (ECF 1, PageID 10; ECF 23, PageID 135-36.) Instead, it appears to be simply concerned that SCS, which it does not directly control, might lose out on funds.[3] This does not establish that the *County* could suffer injury from the loss of ARPA funds.[4]

The County further contends that it has standing because it loses the authority to enforce its health order. (ECF, PageID 5; ECF 23, PageID 135, 137.) But this is not a *legally protected* interest, since Defendant, by statute, has the authority to assume direct operational control of a public health response in the event of an emergency, and he may suspend orders prescribing the procedures for conduct of state business. Tenn. Code Ann. § 58-2-107(a)(1), (e)(1). Moreover, his orders have the force and effect of law, *id.* at § 58-2-107(a)(2), and local governments cannot nullify state law, *see Shore v. Maple Lane Farms, LLC*, 411 S.W.3d 405, 426 (Tenn. 2013).

---

[3] Although the County implies that SCS is only "funded by the County" (ECF 23, PageID 140; *see also id.* at 149 ("[T]he County, who is responsible for funding SCS . . . .")), SCS, as do all other Tennessee LEAs, receive "both state and local funding." *See Tenn. Small Sch. Sys. v. McWherter*, 91 S.W.3d 232, 235-36 (Tenn. 2002) (citing Tenn. Code Ann. § 49-3-356).

[4] In its motion for preliminary injunction, the County relies on one state appellate case holding that budget effects are enough to establish standing—a case currently pending on review in the Tennessee Supreme Court. *Metro Gov't of Nashville & Davidson Cnty. v. Tenn. Dep't of Ed.*, No. M2020-00683-COA-R9-CV, 2020 WL 5807636, at *4 (Tenn. Ct. App. Sept. 29, 2020), *perm. app. granted* (Tenn. Feb. 4, 2021). In that action, the plaintiff counties, qua counties, challenged a state statute as violative of the provisions of Tennessee's home rule amendment, Tenn. Const. art. XI, § 9, para. 2, as local in effect—and not generally applicable throughout the State. By contrast, the EO is of general, state-wide applicability.

Accordingly, the County has not established any actual injury of a legally protected interest under ARPA as a result of the EO.

### B. The County lacks third-party standing to challenge the EO on behalf of its residents.

The County also presumes to represent the constitutional rights of its residents.[5] But third-party standing, even if appropriate, does not satisfy Article III standing. *Kowalski v. Tesmer*, 543 U.S. 125, 130 & n.2 (2004) (assuming without deciding that plaintiffs had established the "alternative threshold" question of Article III standing). Rather, the County must still have its *own* injury to redress, *id.*, and, as stated, it does not.

Regardless, the County may not represent its residents in this case. Third-party standing is a prudential limitation on the Court's authority to hear a case.[6] *June Med. Servs. L. L. C. v. Russo*, 140 S. Ct. 2103, 2117 (2020). Like any other plaintiff, a political subdivision must meet the requirements for third-party standing before representing its residents' interests.[7] *See Amato*

---

[5] In pursuing third-party standing on this issue in their motion for a preliminary injunction (ECF 23, PageID 143-45), the County recognized that it has no Fourteenth Amendment rights of its own that it can pursue against the State or state officers. *See S. Macomb Disposal Auth. v. Township of Washington, Mich.*, 790 F.2d 500, 503-04 (6th Cir. 1986); *see also Greater Heights Acad. v. Zelman*, 522 F.3d 678, 680 (6th Cir. 2008).

[6] Challenges to a party's prudential standing are properly brought under Fed. R. Civ. P. 12(b)(1). *See Roberts v. Hamer*, 655 F.3d 578, 580-81 (6th Cir. 2011) (distinguishing constitutional and prudential standing challenges with those regarding statutory standing); *see also Bullwinkel v. U.S. Dep't of Energy*, No. 1:11-cv-1082-JDB-egb, 2013 WL 392466, at *6 (W.D. Tenn. Jan. 31, 2013) ("Where . . . a challenge is made to a party's constitutional or prudential standing, the motion is properly brought under Rule 12(b)(1).").

[7] *Gomillion v. Lightfoot*, which the County has cited in earlier submissions for the proposition that it may represent the rights of its residents, is not a third-party standing case; the plaintiffs in *Gomillion* were individual residents suing the county and its officers. 364 U.S. 339, 340 (1960). Moreover, *Romer v. Evans*, 517 U.S. 620, 625-26 (1996), which the County also has cited, arose out of *state* court litigation, and the Court did not address political subdivision standing. In state court, the municipalities raised state constitutional claims and claimed they faced potential liability

*v. Wilentz*, 952 F.2d 742, 748-50 (3d Cir. 1991) (discussing third-party-standing doctrine at length in suit between county and state officers); *see also Akron Bd. of Educ. v. State Bd. of Educ. of Ohio*, 490 F.2d 1285, 1289-90 (6th Cir. 1974) (permitting school board to sue in part on behalf of students due to "close" relationship and hinderance to suit while citing third-party and associational standing cases).

To that end, the County must establish that it has "a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). Additionally, a plaintiff seeking to represent the rights of another must have consistent interests with the third party. *See Amato*, 952 F.2d at 749 ("[T]he court must inquire into the impact on third party interests—whether the plaintiff and the third party have consistent interests." (citing *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989))).

First, the County, which is seeking to reinstitute its authority to *mandate* masks, does not have consistent interests with its residents. Non-compliant students are subject to being sent home,[8] and, under SCS's plan, parents are required to purchase masks themselves and have the "responsibility . . . to ensure students arrive at school each day with the necessary face mask" (ECF 23-2, PageID 165). It is therefore far from clear that the County's residents, including its parents and schoolchildren, *want* the EO to be overturned, which counsels against permitting third-party

---

under the Supremacy Clause. *Evans v. Romer*, 854 P.2d 1270, 1272 n.2 (Col. 1993). (ECF 23, PageID 136-37.)

[8] Laura Testino, *After meeting with county attorney, Collierville Schools will enforce mask mandate*, MEMPHIS COMMERCIAL APPEAL (Aug. 9, 2021) ("The Shelby County Health Department issued enforcement guidance Monday morning, stating that students who weren't in compliance with the mask requirement should be sent home."), https://www.commercialappeal.com/story/news/education/2021/08/09/collierville-schools-enforce-mask-mandate/5545867001/.

standing. *See Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976) ("[T]he courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights . . . do not wish to assert them . . . ."); *Amato*, 952 F.2d at 753 ("Although the County's advocacy of its *own* interests has been quite competent and extremely vigorous, we fear that the County may not have adequately advocated [the third-party] interests.").

Second, the County has not even attempted to identify any "hindrance" to suit that resident parents and students might face. *See Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 208-09 (6th Cir. 2011) ("[We] discern no indication here that the students or their parents face any obstacle in litigating their rights themselves."). To meet this showing, the County must establish that resident parents and students are deterred from suing, that their suits might be imminently moot, or that they face systemic practical barriers to suing. *Id.* at 209.

There is demonstrably no deterrent to parents filing suit challenging the EO; they have in fact brought such challenges. The Court is presently considering a case filed by Shelby County students challenging the very same EO on statutory grounds. *G.S. ex rel. Schwaigert, et al. v. Lee* ("*Schwaigert*"), No. 2:21-cv-02552-SHL-atc (W.D. Tenn.). Nor is that the only case where parents (through their children) have initiated their own lawsuit challenging the EO. *See S.B. by and through her parents M.B. and L.H., et al. v. Lee, et al.*, No. 3:21-cv-00317-JRG-dcp (E.D. Tenn.).

Further, a parent's suit is no more at risk of being mooted by the circumstances of a pandemic than is the County's suit. *Cf. Singleton*, 428 U.S. at 117 (temporary nature of pregnancy). Nor are there any systemic or practical barriers to suit: a parent who believes mask mandates are critical to the health of her child has strong incentive to sue, *cf. Powers*, 499 U.S. at 414-15 (third party had little incentive to sue), and there has been no shortage of public attention paid to the EO, *cf. Akron Bd.*, 490 F.2d at 1289-90 (noting "the small area concerned and its

9

minimal present impact"). The County, therefore, lacks standing to pursue its Fourteenth Amendment claim on its residents' behalf.

### III. The County's Federal Claims Fail to State a Claim to Relief.

#### A. The County's Fourteenth Amendment claim lacks merit.

In its first cause of action, the County claims that Defendant, in permitting parents to opt their children out of a mandatory mask requirement, violates its residents' substantive due process rights. (ECF 1, PageID 6-7.) It argues that Defendant's conduct "shocks the conscience," but it entirely ignores a prerequisite to its substantive due process claim: a deprivation of a constitutionally protected liberty or property interest. *See Siefert v. Hamilton Cnty.*, 951 F.3d 753, 766 (6th Cir. 2020) (discussing the various ways the Sixth Circuit has addressed this claim but noting, under more recent law, "a plaintiff must show as a predicate the deprivation of a liberty or property interest" (cleaned up)). The County does not allege *any* constitutionally protected interest that the EO allegedly violated, presumably because it could not identify one.

Based on its reliance on *Guertin v. Michigan*, the County might be invoking the right to bodily integrity, which is "an indispensable right recognized at common law as the 'right to be free from . . . unjustified intrusions on personal security' and 'encompass[ing] freedom from bodily restraint and punishment.'" 912 F.3d 907, 918 (6th Cir. 2019) (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). (ECF 1, PageID 6; ECF 23, PageID 144-46.) The County's reluctance to invoke this explicitly is not surprising, since the right to bodily integrity is about freedom from *forcible intrusions* on a person's body against his will, *id.* at 919, and the County alleges no such intrusion on its citizens' bodily integrity as a result of the EO. Rather, the County seeks to *force* its residents to put masks on their children whereas the EO lets them choose not wear masks.

10

The County's attempt to invoke the "state created danger" doctrine also fails to save its claim. (ECF 23, PageID 144-45.)  Under that doctrine, a plaintiff must establish (1) "an affirmative act by the state which either created or increased the risk that [he] would be exposed to an act of violence by a third party"; (2) "a special danger to [him] wherein the state's actions placed [him] specifically at risk, as distinguished from a risk that affects the public at large"; and (3) "that the state was aware of the 'substantial risk of serious harm' and responded in a way that was 'conscience shocking.'" *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 448–49 (6th Cir. 2021).

Here, the EO has not exposed any of the County's citizens to *violence* on the part of a private party.  Regardless, permitting parents to choose not to send their children to schools in masks is too attenuated from the risk the students face to support the state-created danger theory. It is the decision of the third party to opt out of wearing a mask, not the EO, that creates the allegedly heightened risk of contracting COVID-19.  That the EO precludes the County from enforcing its mandate against these third parties does not satisfy this doctrine.  *Cf. Schroder v. City of Fort Thomas*, 412 F.3d 724, 728-29 (6th Cir. 2005) (failing to enforce or lower speed limit did not give rise to state-created danger liability from acts of reckless drivers).

Nor is the danger "special."  The Sixth Circuit has required that the class affected by the special danger in this context must be so narrow that the government could nearly name the class members individually, so it is not enough to simply point to County schoolchildren broadly.  *Jones v. Reynolds*, 438 F.3d 685, 696-97 (6th Cir. 2006) (class of 150 people was too broad).

Finally, Defendant's decision to permit parents to opt out their children from a mask requirement is not "conscience shocking."  An official's action is not "conscience shocking" if he had a "legitimate governmental purpose" for the action.  *Doe v. Jackson Local Sch. Dist. Bd. of*

11

*Educ.*, 954 F.3d 925, 933-34 (6th Cir. 2020). Defendant has a compelling and legitimate purpose here: respecting parents' "fundamental right to make decisions concerning the care, custody, and control of [their] children." *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 418 (6th Cir. 2019) (quoting *Troxel v. Granville*, 530 U.S. 57, 72 (2000)). Additionally, it is no secret that mask mandates in Tennessee have become a fraught issue, threatening to spill over into classroom disruption.[9] That implicates another legitimate governmental purpose: preventing "substantial disruption of or material interference with school activity." *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 513-14 (1969). Defendant appropriately balanced these competing interests by encouraging mask-wearing while also permitting parents to opt their children out of mask requirements.

**B.     The County's ARPA claim is baseless.**

The County also fails to state a claim under ARPA. The County does not have a private cause of action under ARPA, nor is it subject to equitable enforcement. Further, nothing in ARPA mandates that LEAs adopt *any* CDC guidance, let alone *all* its guidance.

**1.     ARPA does not provide the County with a private cause of action against Defendant.**

The County presumably can appeal to no authority for its right to sue under ARPA other than the Supremacy Clause. (*See* ECF 1, PageID 8-10, at ¶¶ 38-48.) But the Supremacy Clause does not create an implied cause of action,[10] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S.

---

[9] Anika Exum and Brinley Hineman, *Williamson County Schools board votes to require masks in elementary schools during raucous meeting*, TENNESSEAN (Aug. 10, 2021), https://www.tennessean.com/story/news/local/williamson/2021/08/10/williamson-county-schools-board-meeting-covid-19-protocols-live/5540109001/.

[10] Although political subdivisions cannot sue States or state officers in federal court for alleged constitutional violations, some courts have permitted political subdivisions to sue under the Supremacy Clause. *E.g.*, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176, 177 (3d

320, 324-35 (2015), nor does the Declaratory Judgment Act furnish one, *Davis v. United States*, 499 F.3d 590, 594 (6th Cir. 2007).

The County has also not invoked 42 U.S.C. § 1983,[11] and for good reason: ARPA does not grant the County any *rights* that it has been allegedly denied; instead, the County claims that the EO frustrates SCS's *obligations* under ARPA. *See* 42 U.S.C. § 1983 (providing a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws"); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (Congress must be unambiguous when conferring rights enforceable via § 1983). Moreover, § 1983 actions are personal, *see Claybrook v. Birchwell*, 199 F.3d 350, 357 (6th Cir. 2000), so the County could not rely upon any rights granted to SCS even if they existed.

This leaves it for the County to invoke the Court's equitable power under *Ex parte Young*, 209 U.S. 123, 155-56 (1908), which permits a plaintiff to seek prospective injunctive relief against a state officer if that officer violates federal law. But Section 2001 of ARPA is not subject to equitable enforcement. "The power of federal courts of equity to enjoin unlawful executive action is subject to express and implied statutory limitations." *Armstrong*, 575 U.S. at 327 (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996)). Whether private enforcement of a statute under the Court's equitable power is permitted turns on whether Congress intended to

---

Cir. 2021). *But see Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1364 (9th Cir. 1998) (holding a political subdivision lacks standing to sue its own State under the Supremacy Clause). The Sixth Circuit has noted but not formally adopted this type of political-subdivision standing. *S. Macomb*, 790 F.2d at 504. The Court need not decide that issue in this case because the County's ARPA claim lacks merit.

[11] The County does seek attorney's fees under 42 U.S.C. § 1988 (ECF 1, PageID 11), but that does not give rise to any cause of action, *Cortis v. City of Coleman*, No. 1:10-cv-13261-BC, 2011 WL 1518901, at *6 (E.D. Mich. Apr. 20, 2011).

13

foreclose equitable relief in the invoked statute. *Id.* at 328 (citing *Verizon Md., Inc. v. Public Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)).

*Armstrong* is instructive on this point.  In that case, Medicaid providers sued the State to enforce a provision of the Medicaid Act, alleging that the State was not properly reimbursing them. *Id.* at 324.  The Court rejected the providers' claim that the Court should permit the action under its equitable powers.  The Medicaid Act, by vesting sole enforcement authority (by way of the power to withhold funds) in the Secretary of Health and Human Services, implicitly precluded private enforcement of its provisions. *Id.* at 328.  Granted, the Secretary's enforcement authority, by itself, might not always preclude equitable relief. *Id.* (citing *Va. Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 256 n.3 (2011)).  But the statute at issue in *Armstrong* was also "judicially unadministrable" since it included a broad and unspecific mandate that plans provide payments that were "'consistent with efficiency, economy, and quality of care,' all the while 'safeguard[ing] against unnecessary utilization of . . . care and services.'" *Id.*  The Court concluded that Congress vested sole enforcement in the Secretary because it wanted to achieve "the expertise, uniformity, widespread consultation, and resulting administrative guidance that can accompany agency decisionmaking, and avoid[] the comparative risk of inconsistent interpretations and misincentives that can arise out of an occasional inappropriate application of the statute in a private action." *Id.* at 328-29.

For similar reasons, Section 2001 of ARPA cannot be enforced through an equitable action. Because the Secretary is charged with responsibility for distributing ARPA funds under § 2001(b), these funds constitute an "applicable program" under 20 U.S.C. § 1221(c)(1),[12] for which the

---

[12] The Secretary himself has taken the position that ARPA is an "applicable program" in ARPA's implementing regulations.  86 Fed. Reg. at 21197.

14

Secretary has a number of enforcement options, including withholding payment, issuing a cease-and-desist order, entering into a compliance agreement, or ultimately seeking recovery of funds. 20 U.S.C. § 1234c.  Thus, enforcement of ARPA's provisions is vested in the Secretary, which suggests Congress did not intend to permit equitable enforcement.  *See Armstrong*, 575 U.S. at 328; *see also Gonzaga Univ.*, 536 U.S. at 289 (finding that the Family Educational Rights and Privacy Act of 1974 did not create enforceable rights under § 1983 in part because of the Secretary's enforcement authority); *Seminole Tribe*, 517 U.S. at 74 ("detailed remedial scheme" precluded equitable enforcement).

Further, as in *Armstrong*, ARPA's mandates are judicially unadministrable.  Section 2001(i)(1) requires that LEAs publish "a plan for safe return to in-person instruction and continuity of services."  Pub. L. 117-2, 135 Stat. 4, § 2001(i)(1).  This is a broad, undefined mandate (e.g., what is "safe," how much "in-person" instruction and when, continuity of *which* services?) that suggests Congress wanted the uniformity and expertise afforded by administrative guidance and decisionmaking.  Indeed, the Secretary has already issued an extensive, detailed regulation, providing States and LEAs guidance on what the plans should entail and how they should be implemented. Am. Rescue Plan Act Elementary and Secondary School Emergency Relief Fund, 86 Fed. Reg. 21195-01, 21201-02, 2021 WL 1561821 (Apr. 22, 2001).

Moreover, were ARPA's education funding provisions privately enforceable, litigation could ensue between States and LEAs across the country.  Congress could not have intended to risk the "inconsistent interpretations and misincentives" that would inevitably arise from litigation, *see Armstrong*, 575 U.S. at 328-29, thereby frustrating ARPA's goal of returning to in-person schooling with as little disruption as possible.

### 2.     The EO does not conflict with ARPA or its implementing regulation.

Even if the Court reaches the substance of the County's ARPA claim, the EO does not conflict with any portion of ARPA or, for that matter, its implementing regulation.

To encourage Tennessee to adopt regulations that it would prefer, Congress enacted legislation pursuant to the Spending Clause that imposes conditions on the acceptance of the funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). But "[t]he legitimacy of Congress' power to legislate under the spending power . . . rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Id.* "Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.*; *see Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014) ("Clarity is demanded *whenever* Congress legislates through the spending power . . . .").

Here, ARPA contains no *unambiguous* indication that, upon taking ARPA funds, the State was required to adopt a universal mask mandate or that it was surrendering its authority to weigh in on the appropriate classroom protocols for Tennessee schoolchildren. The only conditions attached to taking funds under Section 2001 were obligations imposed on the LEAs: that each LEA develop a plan for return to in-school learning or for a continuity of services, Pub. L. 117-2, 135 Stat. 4, §2001(i), and that the LEAs spend excess ARPA funds toward one of a limited set of purposes, *id.* §2001(e). And while one of those acceptable purposes is the implementation of public health protocols in line with CDC guidance, even that is qualified with "to the greatest extent practicable." *Id.* § 2001(e)(2)(Q).

Because ARPA itself does it no good, the County turns instead to the Secretary's implementing regulation. The regulation does require an LEA's plan to state whether and to what extent the LEA will adopt CDC guidance, including universal mask wearing. 86 Fed. Reg. at

21201.  But the regulation does *not* mandate that the LEA impose a mask requirement.  The Secretary says so explicitly: "The requirement [issued by the Secretary] *does not mandate that an LEA adopt the CDC guidance*, but only requires that the LEA describe in its plan the extent to which it has adopted the key prevention and mitigation strategies identified in the guidance."  *Id.* at 21200 (emphasis added).

*Lawrence County v. Lead–Deadwood Sch. Dist. No. 40–1*, does not help the County either.  469 U.S. 256, 269-70 (1985); (ECF 23, PageID 140-43).  There, the State put additional conditions on the disbursement of federal funds contrary to unambiguous congressional intent.  469 U.S. at 264-65, 269.  The statute at stake in *Lawrence County* granted the local governmental unit the *right* to use funds for "any governmental purpose." 469 U.S. at 258-59 (quoting 31 U.S.C. § 6902(a)).  But in ARPA, Congress imposed only *obligations* on the LEAs.  *Compare* Pub. L. 117-2, 135 Stat. 4, § 2001(e)(2)(Q) (an LEA "that receives funds under this section . . . *shall* use the remaining funds for any of the following . . . ." (emphasis added)), *with Lawrence Cnty.*, 469 U.S. at 258-59 (the local governmental unit "*may* use the payment for any governmental purpose" (emphasis added)).  And it certainly did not express any *unambiguous* requirement that States surrender all COVID-19 protocol authority to LEAs.

The Secretary's implementing regulation supports this view.  It requires that the state educational agencies ("SEAs") provide and publicly post their own plans that address "the current education needs within the State, the SEA's intended uses of ARP[A] funds, and the plans for supporting LEAs in their planning for and use of ARP[A] funds."  86 Fed. Reg. at 21197.  In developing these plans, the SEA must have "ongoing communication with the public," including dialogue with "diverse stakeholders" such as students, families, civil rights organizations, and others.  *Id.* at 21197-98, 21201.  The SEA is also required to take this input into account so that it

17

will be "better positioned to fully understand and adequately respond to the education needs in the State and the impact of the COVID-19 pandemic on all students." *Id.* at 21198.

Moreover, the LEA is required to submit *its* plan—the very plan that must indicate whether it has adopted the CDC guidance—to the SEA. *Id.* at 21198, 21201; (*see also* ECF 23-2, PageID 156 (SCS's submission for the "safe return to in-person instruction" to the Tennessee Department of Education)). The Secretary made clear that the SEA "is best situated to determine what additional requirements to include" in the LEA's plan. 86 Fed. Reg. at 21199. If the State had given up its authority to control the content of the LEAs' plans, it would be odd beyond measure for the Secretary to require the SEA to oversee the LEA's plans all while considering public comment from across the State.[13] Since the EO does not conflict with any unambiguous provision of ARPA or its regulations, the Court should dismiss the County's claim.

## IV. The County's State-Law Claim Should Be Dismissed.

Finally, the Court should exercise its discretion and dismiss the County's state claim. The County's claim arises from the Education Clause of the Tennessee Constitution, Tenn. Const., art. XI, § 12. (ECF 1, PageID 7-8). Courts, however, generally do "not reach [a plaintiff's] state law claim[]" after dismissing their "federal law claim[s]." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 521 (6th Cir. 2007). And while a "district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims," "the balance of considerations usually will point to dismissing the state law claims." *Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1254-55 (6th Cir. 1996). A court should only exercise such jurisdiction "where the interests of judicial economy and the avoidance of multiplicity of litigation outweigh [a court's]

---

[13] That the Secretary has recently urged Defendant to defer to the LEA is of no moment. *Cf. Lawrence Cnty.*, 469 U.S. at 261 (noting that the relevant agency "has *consistently* adhered to the view" that local governments could use the funds as they saw fit (emphasis added)).

concern over needlessly deciding state law issues." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006) (cleaned up). Here, after dismissing the County's federal-law claims, the Court should decline to exercise supplemental jurisdiction because, on balance, neither judicial economy nor multiplicity outweighs the Court's concern "over needlessly deciding state law issues." *See id.*

Even if the Court were to assume jurisdiction over the County's Education Clause claim, it fails to state a claim upon which relief can be granted. The County asserts that the EO interferes with its "obligations to provide for the health, safety, and public education to the children of Shelby County." (ECF 1, PageID 8.) But the County has no such obligation under the Education Clause. That Clause tasks the General Assembly only with "provid[ing] for the maintenance, support and eligibility standards of a system of free public schools." Tenn. Const. art. XI, § 12. Further, in Tennessee, "providing education is a State function," not a political subdivision's duty. *See State ex rel. Weaver v. Ayers*, 756 S.W.2d 217, 221 (Tenn. 1988); *see also Rollins*, 154 F.3d at 629-30. Therefore, the Court should also dismiss the County's Education Clause claim, should it reach the issue.

## CONCLUSION

For the reasons stated, the Court should grant Defendant's motion to dismiss.

Respectfully submitted,

HERBERT H. SLATERY III
Attorney General and Reporter


s/James R. Newsom III
James R. Newsom (TN BPR No. 6683)
Special Counsel
Matthew R. Dowty (TN BPR No. 32078)
Assistant Attorney General
Robert W. Wilson (TN BPR No. 34492)
Assistant Attorney General
Office of the Tennessee Attorney General
40 South Main Street, Suite 1014
Memphis, TN 38103
(901) 543-2473
Jim.Newsom@ag.tn.gov
Matthew.Dowty@ag.tn.gov
Robert.Wilson@ag.tn.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 17th day of September, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing report. Parties may access this filing through the Court's electronic filing system.

s/James R. Newsom III
James R. Newsom (TN BPR No. 6683)
Special Counsel
Office of the Tennessee Attorney General
40 South Main Street, Suite 1014
Memphis, TN 38103
(901) 543-2473
Jim.Newsom@ag.tn.gov
